**FITZGERALD JOSEPH LLP**
JACK FITZGERALD (SBN 257370)
*jack@fitzgeraldjoseph.com*
PAUL K. JOSEPH (SBN 287057)
*paul@fitzgeraldjoseph.com*
MELANIE PERSINGER (SBN 275423)
*melanie@fitzgeraldjoseph.com*
TREVOR M. FLYNN (SBN 253362)
*trevor@fitzgeraldjoseph.com*
CAROLINE S. EMHARDT (SBN 321222)
*caroline@fitzgeraldjoseph.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiff***

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TARA AMADO, on behalf of herself, all others similarly situated, and the general public,<br><br>Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE CO.,<br><br>Defendant. | Case No.: 23-cv-06308<br><br>CLASS ACTION<br><br>**CLASS ACTION COMPLAINT FOR CONSUMER FRAUD, BREACH OF IMPLIED WARRANTIES, NEGLIGENT AND INTENTIONAL MIREPRESENTATION, UNJUST ENRICHMENT, AND VIOLATION OF PROPOSITION 65**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Tara Amado, on behalf of herself, all others similarly situated, and the general public, by and through her undersigned counsel, hereby sues The Procter & Gamble Co. ("P&G"), and alleges the following upon her own knowledge, or where she lacks personal knowledge, upon information and belief, including the investigation of her counsel.

## INTRODUCTION

1. P&G sells Metamucil, a psyllium fiber supplement, which it markets as healthy and safe for consumers 12 years and older (the "Metamucil Products").

2. P&G's health and safety representations are false or at least highly misleading, however, because the Metamucil Products contain dangerous amounts of lead and P&G fails to disclose material facts regarding that lead content and its potentially harmful effects on consumers.

3. P&G also failed to include a Proposition 65 warning on the Metamucil Products, as it was required.

4. Plaintiff brings this action against P&G on behalf of herself, similarly situated Class Members, and the general public to enjoin P&G from deceptively marketing the Metamucil Products, and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

5. This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs and at least one member of the class of plaintiffs is a citizen of a state different from P&G. In addition, more than two-thirds of the members of the class reside in states other than the state in which P&G is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

6. The Court has personal jurisdiction over P&G as a result of P&G's substantial, continuous and systematic contacts with the State, and because P&G has purposely availed itself of the benefits and privileges of conducting business activities within the State, including by marketing, distributing, and selling the Metamucil Products in California.

7. Venue is proper in this Northern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because P&G resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial

part of the events or omissions giving rise to the claims occurred in this district.

## DIVISIONAL ASSIGNMENT

8.     This civil action arises out of the acts and omissions of P&G, which occurred in San Mateo County. Therefore, pursuant to Civil Local Rule 3-2(c) and (d), this action is correctly assigned to the San Francisco or Oakland Division.

## PARTIES

9.     Plaintiff Tara Amado is a citizen of California because she resides in San Bruno, California and intends to remain there. On August 2, 2023, Plaintiff gave P&G the notice required under Proposition 65.

10.     Defendant The Proctor & Gamble Company is an Ohio corporation with its principal place of business in Cincinnati, Ohio.

## FACTS

### I.     P&G Markets Metamucil as Healthy and Safe for Consumers 12 Years and Older

11.     During at least the four years preceding the filing of this Complaint (the "Class Period") P&G has manufactured, marketed, distributed, and sold Metamucil, a psyllium fiber supplement, in a variety of flavors and sizes.[1]

12.     Through various statements, the Metamucil Products' labels suggest they are generally healthy and safe for consumption. These statements include representations that the Metamucil Products are doctor recommended and sealed for safety against adulterants.

13.     First, P&G represents the Metamucil Products are the "**#1 Doctor Recommended Brand**."

14.     As P&G knows, the "Doctor Recommended" statement on every Metamucil Product "adds credibility to [the] brand," including the message that the Products are healthy and safe, and "drives consumers to act," with "82% . . . say[ing] this claim is highly influential in their purchase decisions."[2]

---

[1] The Metamucil Products challenged herein include all flavors, sizes, and varieties of (i) Metamucil Made with Real Sugar, (ii) Metamucil on-the-go!, (iii) Metamucil Sugar Free, (iv) Metamucil No Added Sweeteners, (v) Metamucil Premium Blend, and (vi) Metamucil Fiber + Collagen Peptides.

[2] *See* Linda Ruschau, "Why Your OTC Brand Should be Messaging in the Doctor's Office," Patient Point (Oct. 12, 2022), *at* https://www.patientpoint.com/blog/otc-brand-messaging-doctor-office (noting "Tom Finn, Retired President, Global Personal Health Care at Procter & Gamble," discussing the "success they have had in gaining the coveted '#1 Doctor Recommended' claim").

15.     Tom Finn, president of P&G's global personal healthcare business until June of 2020, called its use of the "Doctor Recommended" statement a "high-performing tactic[]" and "the most effective and durable way to trade in new consumers to a healthcare market."[3] He said he encouraged "a presence in the office" of doctors and noted "these engagement programs can help to achieve and sustain the all-important 'No. 1 Doctor Recommended' claim," since "product usage initiated by a doctor's recommendation [is] far more robust and much more durable than usage generated strictly from consumer advertising or PR."[4]

16.     On every Metamucil Product, the "Doctor Recommended" statement is shown in a circular "seal," called out by a contrasting color, which is near medical advice regarding the product, such as the conditions under which someone should consult a doctor before use, how to use the product in combination with medicines, and signs of a serious condition that indicate when to stop product use and consult a doctor. The medical advice and "Doctor Recommended" statements are also adjacent to instructions on "How To Take Metamucil (For adults 12 years and older)," to achieve its supposed health benefits. Placement of the "Doctor Recommended" statement near medical advice and instructions for use further suggests and thus reinforces that the Metamucil Products have been evaluated and approved by doctors as healthy and safe when taken as directed.

17.     Reasonable consumers therefore believe the "Doctor Recommended" representation means a substantial number of doctors, after receiving "professional education" on "the potential uses, proven benefits and proper administration"[5] of the Metamucil Products, endorsed them as healthy and safe at the recommended intake levels.

18.     Second, through one or more of the following statements, P&G represents on the labeling of the Metamucil Products that they are sealed for safety against adulterants: (i) "**Do Not Use If Printed Seal Is Broken Or Missing**," (ii) "**Do Not Use If Printed Inner Seal is Broken or Missing**," (iii) "**Tamper Evident: Do not use if printed seal under cap is missing or damaged**," (iv) "**Individual Packets Sealed**

---

[3] Linda Ruschau and Tom Finn, "A Former P&G Exec Sees Prospects For Healthcare Brand Growth," AdAge (Nov. 1, 2021), *at* https://adage.com/article/PatientPoint/how-otc-brands-can-find-opportunities-doctors-office/2377051.

[4] *Id.*

[5] *See id.*

**For Your Protection**," and (v) "**Do Not Use If Package Is Torn**."

19.    Research shows reasonable consumers view such tamper-evident packaging as reassurance that a product is free from toxic adulterants like lead.[6] "Brands that utilize tamper-evident packaging demonstrate their commitment to consumer safety, enhancing their reputation and fostering trust among their customers" because it "protects consumers from ingesting or using products that have been compromised during storage or transit."[7] "Tamper-evident seals on food and beverage products," like those on the Metamucil Products, "offer consumers peace of mind by guaranteeing the product's freshness and safety."[8]

20.    Further demonstrating the importance of these safety representations to consumers, the tamper-evident label market was valued at $13.21 Billion in 2021 and is projected to grow by 5.68% to $21.54 Billion by 2030.[9]

21.    Third, the labels of three Metamucil Product varieties—Sugar Free, Premium Blend, and Fiber + Collagen Peptides—reinforce and continue P&G's health and safety messaging by touting the products as "**Better Choices for Life**,"[10] a "**Premium Blend**,"[11] or a "**Rejuvenation Blend For Daily Digestive Health**."[12] The Fiber + Collagen Peptides variety also encourages consumers to "**add to your**

---

[6] *See* Misbah Syed, "Tamper-Evident Packaging: Enhancing Product Security and Consumer Trust (Aug. 29, 2023), https://www.linkedin.com/pulse/tamper-evident-packaging-enhancing-product-security-consumer-syed/?trk=article-ssr-frontend-pulse_more-articles_related-content-card ["Syed, Tamper-Evident Packaging"]; *see also* In Stock Labels, "Why Use Tamper-Evident Labels?" https://instocklabels.com/why-use-tamper-evident-labels (tamper evident labels "keep people safe and build trust in your company"); Etiquette, "The Great Power of Tamper-Evident Labels: Safeguarding Product Integrity and Consumer Trust (Aug. 10, 2023), https://www.etiquette.co.uk/blog/the-great-power-of-tamper-evident-labels-safeguarding-product-integrity-and-consumer-trust (The "added layer of security [provided by tamper-evident labels] protects the product and helps build trust with consumers, who can now be confident that the product they are purchasing is safe and authentic.").

[7] Syed, Tamper-Evident Packaging, *supra* n.6.

[8] *Id.*

[9] Verified Market Research, "Tamper Evidence Labels Market Size and Forecast" (Sept. 2023), *available at* https://www.verifiedmarketresearch.com/product/tamper-evident-labels-market.

[10] On Sugar Free and Premium Blend varieties.

[11] On the Premium Blend variety.

[12] On the Fiber + Collagen Peptides variety.

**daily health routine**" because it supposedly "**traps and removes the waste that weighs you down, so you'll feel lighter, more energetic, and rejuvenated.**" These statements further convey to consumers that the Metamucil Products are healthy, safe to consume, and free from toxic adulterants like lead.

22.     First, According to the American Diabetes Association, "Consumers can look for the ["Better Choices for Life"] mark to understand whether the product's claims are supported by scientific evidence and meet the ADA's guidelines."[13] Because reasonable consumers would assume scientific evidence would not support daily consumption of an unhealthy or unsafe product, P&G's use of the mark suggests Metamucil Sugar Free and Premium Blend are healthy and safe.

23.     Similarly, P&G's branding one variety a "Premium Blend" tells consumers the product is "of exceptional quality,"[14] furthering P&G's message that the product is healthy and safe to consume, as reasonable consumers believe products of exceptional quality are not unhealthy, unsafe, or contaminated with toxic substances like lead.

24.     P&G's use of "Rejuvenation Blend For Daily Digestive Health," "add to your daily health routine," and "traps and removes the waste that weighs you down, so you'll feel lighter, more energetic, and rejuvenated" on Metamucil Fiber + Collagen Peptides likewise communicates to consumers that the products are healthy and safe. Reasonable consumers would assume P&G would not encourage daily use as part of a health routine a product that is actually unhealthy or unsafe for consumption.

25.     Exemplars of the Metamucil Products' packaging appear below.



---

[13] 2022 IRS Form 990 American Diabetes Association, available at https://tinyurl.com/bdh37wka.

[14] https://www.merriam-webster.com/dictionary/premium (adjective definition).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28






1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16




17    26.    The Metamucil Product labeling also directs consumers to P&G's website, www.pg.com,

18    and the product website, www.metamucil.com, both of which reinforce the message that the Metamucil

19    Products are healthy, safe, and free from adulterants like lead.

20    27.    P&G's website has a section dedicated to "Product Safety," where it reassures consumers

21    that "We hold ourselves to the highest standard[.] For more than 185 years, your safety and the safety of

22    your world has been at the heart of what we do. That's why we have a team of more than 500 scientists and

23    professionals and a rigorous safety process to analyze every ingredient—before we ever consider putting it

24    in one of our products."[15]

25    28.    P&G further tells consumers that "Safety is at the heart of everything we do. Before we

26    market a new product, we go beyond regulatory compliance to ensure every ingredient's safety through a

27

28    [15] https://us.pg.com/product-safety

four-step, science-based process. We use the same process as regulatory agencies around the world, like US FDA, EPA, the EU, the WHO, and others."[16]

29.     In another section of its website dedicated to "Ingredients," P&G reiterates that "Safety is our first ingredient. We know you want to know as much as you can about our products and their ingredients. That's why we're continuing to provide transparency around our ingredient innovation and safety science."[17] P&G notes that "both natural and synthetic ingredients have a safe range and an unsafe range," and reassures consumers it "define[s] the safe range of every ingredient" by "apply[ing] the same science-based approach as regulatory agencies around the world."[18] These statements are further reinforced by images on P&G's website, like the one below.



## Ingredient choices and how we make them

Some people believe natural product ingredients are safer to use than man-made, synthetic ones. The reality is that it's not that simple; both natural and synthetic ingredients have a safe range and an unsafe range. Even basics like sunlight, oxygen, and water have safety limits. So what goes into choosing our product ingredients?

1) Safety. First we define **the safe range for every ingredient**, whether natural or synthetic. Then we apply the same science-based approach as regulatory agencies around the world.

30.     Under the heading, "Ingredients we do not use," P&G lists "Heavy metals: Arsenic, Lead, Chromium," among other known toxins, below which it states, "We have strict product safety limits in place

_____

[16] *Id.*

[17] https://us.pg.com/ingredients

[18] *Id.*

when any of these materials could be found in tiny amounts due to their natural (or background) presence in water, the environment, or as part of the manufacturing process."[19]

31.     The Metamucil Product website further reinforces P&G's messaging that the Metamucil Products are healthy and safe. For example, the website has dozens of articles about health and wellness, including photos and videos of medical professionals in lab coats.[20] In one article, P&G even tells consumers the Metamucil Products are safe to consume daily during pregnancy.[21]

32.     The Metamucil website also has a section for "Frequently Asked Questions," including specifically for "Health Care Providers," which discusses Metamucil's "Benefits, Dosage, [and] Side Effects[.]"[22] The general FAQ reassures consumers Metamucil "is safe to take daily."[23]

33.     Through the Metamucil website and additional off-label advertising, including at least radio and digital advertisements, P&G also urges consumers to:

> "Sign up for Metamucil's Two-Week Challenge today to motivate yourself to add this healthy habit to your routine every day. The digestive system is so important to the overall health and wellbeing of the body. That's why it's key to support your gut health every day by giving it all the nutrients it needs. One nutrient—fiber—plays a key role in keeping the digestive system working at its best. . . . [W]hen taken daily, Metamucil can help trap and remove the waste that weighs you down[ ] so you can feel lighter and more energetic.[ ]"[24]

34.     The purpose of the two-week challenge is to "help[] you get started with your daily Metamucil routine" and be "[w]ell on your way to making it a part of your daily health routine."[25] To help with this, those that sign up for the challenge "get an email every day for two weeks with tips, tricks, and

---

[19] *Id.*

[20] *See* https://www.metamucil.com/en-us/articles

[21] https://www.metamucil.com/en-us/articles/constipation/constipation-in-pregnancy   ("remedies   for constipation during pregnancy" include "take Metamucil daily").

[22] https://www.metamucil.com/en-us/faqs/hcp-faqs

[23] *See* https://www.metamucil.com/en-us/faqs/metamucil-faqs (answers to "Q: What is Metamucil used for?" and "Q: Is Metamucil a laxative?").

[24] *See* https://www.metamucil.com/en-us/articles/metamucil-benefits/the-two-week-challenge-easiest-way-to-stay-regular-and-avoid.

[25] *Id.*

reminders to keep [them] going strong on [their] daily Metamucil."[26] P&G tells consumers it "believe[s] that Metamucil can make a difference in your overall health . . . ."[27]

## II.   P&G Instructs Consumers to Take Metamucil Up to Three Times Per Day

35.   On the back of each Metamucil Product label or packaging, P&G instructs Metamucil consumers, identified as "adults 12 years and older," "How Much to Take" to achieve the advertised health benefits.

36.   Specifically, P&G instructs consumers to take 1 to 2 packets, rounded teaspoons, or rounded tablespoons, depending on variety, up to 3 times per day, as follows:

| Product(s) | Instructions for Use | Daily Intake |
|---|---|---|
| Metamucil On-The-Go | 1 or 2 packets, up to 3 times per day (as shown below)<br> | 1 to 6 packets |

| Product(s) | Instructions for Use | Daily Intake |
|---|---|---|
| Metamucil Sugar Free<br><br>Metamucil No Added Sweetener<br><br>Metamucil Made with Real Sugar (Unflavored) | 1 or 2 Rounded Teaspoons, up to 3 times per day (as shown below)<br><br> | 1 to 6 Rounded Teaspoons |
| Metamucil Made with Real Sugar (Orange and Berry flavored) | 1 or 2 Rounded Tablespoons, up to 3 times per day (as shown below)<br><br> | 1 to 6 Rounded Tablespoons |

*Amado v. Procter & Gamble Co.*, No. 23-cv-06308
CLASS ACTION COMPLAINT

| Product(s) | Instructions for Use | Daily Intake |
|---|---|---|
| Metamucil Fiber + Collagen Orange | 2 Heaping Teaspoons, up to 3 times per day (as shown below)<br> | 2 to 6 Heaping Teaspoons |
| Metamucil Premium Blend | 1 or 2 Rounded Teaspoons, up to 3 times per day (as shown below)<br> | 1 to 6 Rounded Teaspoons |

37. Further, P&G encourages consumers to take the above amounts of Metamucil on a daily basis, stating on each Metamucil Product's label that consumers should "start with one serving per day[ and] gradually increase to desired *daily* intake."

38. The label of Metamucil on-the-go! also says the packets "are a portable way to get an extra serving of fiber every day." Similarly, Metamucil Fiber + Collagen Peptides is touted as a "Rejuvenation Blend For Daily Digestive Health," and its label encourages consumers to "add [it] to [their] daily health

13

routine" and "Enjoy Rejuvenation Blend Daily!"

39.     P&G further encourages the daily consumption of Metamucil on its website. For example, on its website FAQ, in response to the question "How much Metamucil should I take?," P&G tells consumers that "For best results, we recommend taking Metamucil daily." Further, in response to the question "Can I take Metamucil every day?," P&G responds "Yes! For best results, we recommend taking the dietary fiber supplement Metamucil every day. Metamucil fiber powders can be taken up to three times per day as a dietary fiber supplement."[28]

40.     Daily use of Metamucil is also encouraged through P&G's Metamucil Two-Week Challenge, which P&G says is designed to "mak[e] [Metamucil] a part of your daily health routine." P&G tells consumers to "Keep Taking Metamucil Beyond the Two Weeks . . . every day, 365 days a year!" It further encourages them to "Keep up [their] daily psyllium fiber routine so [they] can feel what lighter feels like[ ] year-round."[29]

41.     P&G instructing consumers to take the Metamucil Products multiple times daily reinforces the message that the products are healthy and safe. Reasonable consumers understand that daily consumption of unhealthy and dangerous foods should not be encouraged, but instead strictly limited. Further, reasonable consumers believe that dosage and use instructions on a "Doctor Recommended" product will result in healthy and safe consumption levels.

## III.     P&G's Health and Safety Representations are False and Misleading Because the Products Contain Dangerous Amounts of Lead, which P&G Fails to Disclose

### A.     Lead Consumption is Harmful to Human Health

42.     Lead is a heavy metal. It has no positive physiological role in the human body, but its harmful effects are manifold. At the cellular level, "heavy metals, including lead, create reactive radicals which damage cell structures, including DNA and cell membrane."[30] For humans, lead is a cumulative toxicant

---

[28] Procter & Gamble, "Metamucil FAQs: Frequently Asked Questions," *at* https://www.metamucil.com/en-us/faqs/metamucil-faqs.

[29]   https://www.metamucil.com/en-us/articles/metamucil-benefits/the-two-week-challenge-easiest-way-to-stay-regular-and-avoid

[30] "Lead" in Kosnett M.J. et al., Poisoning and Drug Overdose, McGraw Hill Professional (5th ed. 2006).

that negatively affects multiple body systems, including the neurological, haematological, gastrointestinal, cardiovascular, immune, and renal systems.[31]

43. Lead exposure is particularly harmful to children. At high levels of exposure, lead attacks the brain and central nervous system, and can cause convulsions, comas, and death. Moreover, children who survive lead poisoning may be left intellectually disabled or with behavioral disorders.

44. Even when lead exposure is not severe or obvious, its effects are pernicious. At lower levels of exposure, lead produces a spectrum of injuries across multiple body systems. For example, it can affect children's brain development, resulting in lower IQ, and can cause behavioral changes such as reduced attention span, increased antisocial behavior, and reduced educational attainment. Lead exposure can also cause anemia, hypertension, renal impairment, immunotoxicity, toxicity to the reproductive organs, type 2 diabetes, and cancer. The damaging neurological and behavioral effects of lead are believed to be irreversible. For example, "Metal toxicants which affect the immune system may contribute to an increased incidence of autoimmune diseases, infectious diseases and cancer. . . . In some instances the immune system appears to be exquisitely sensitive to the toxic heavy metal lead as compared to other toxicological parameters."[32]

45. Lead in the body is distributed to the brain, liver, kidneys and bones, and stored in the teeth and bones, where it accumulates over time. In times of stress, however, "the body can mobilize lead stores, thereby increasing the level of lead in the blood."[33] For example, lead that has accumulated in the bones is released into blood during pregnancy, exposing the fetus to lead. Thus, while the Metamucil Products are ostensibly for persons aged 12 and older, their use by adults can still exposure young children to lead.

---

[31] World Health Organization, "Exposure to Lead: A Major Public Health Concern" (2d ed. 2021), *available at* https://www.who.int/publications/i/item/9789240037656.

[32] Mishra, K.P., "Lead exposure and its impact on immune system: a review," TOXICOLOGY, Vol. 23, No. 6, at 969-72 (Sept. 2009) (emphasis added); *see also* Pukanha, K. et al., "The Immunotoxicity of Chronic Exposure to High Levels of Lead: An Ex Vivo Investigation," TOXICS, Vol. 8, No. 3, at 56 (July 2020) (Concluding that "chronic high Pb exposure may cause a shift toward humoral immune response, together with a suppression of cellular immunity, thereby suggesting an elevation in cancer risk of Pb-exposed workers.").

[33] Centers for Disease Control and Prevention, "What is the Biological Fate of Lead in the Body?" (June 12, 2019), https://www.atsdr.cdc.gov/csem/leadtoxicity/biologic_fate.html.

46.     Its ability to accumulate in the body and lie in wait to be released into the blood without control and at unexpected times, makes lead particularly dangerous. Moreover, because lead accumulates in the body with repeated exposure, even "extremely low" levels of consistent lead exposure can, for example, "reduce the cognitive capacity of children."[34] Moreover, as lead exposure increases, the range and severity of symptoms and effects also increase.

47.     As a result, the World Health Organization has declared that "There is no level of exposure to lead that is known to be without harmful effects," and "There is no known safe blood lead concentration."[35]

48.     According to the United Nations Children's Fund, known globally as UNICEF, "[l]ead is a highly poisonous element that is responsible for nearly 1.5 percent of annual global deaths – almost as many deaths as from HIV and AIDS, and more than from malaria" and, in fact, "the impact of lead on adults is so large that over 900,000 premature deaths per year are attributed to lead exposure."[36]

49.     Moreover, to help consumers avoid cancer and reproductive system disorders, pursuant to Proposition 65, California has promulgated a maximum allowable dose level (MADL) for lead of 0.5 µg (micrograms, sometimes expressed mcg) per day.

**B.      The Metamucil Products Contain Dangerous Amounts of Lead**

50.     Independent laboratory testing completed in July 2023 by an ISO-accredited laboratory demonstrates that the Metamucil Products contain high levels of lead, with each serving of each Metamucil Product containing, for example, more than the 0.5 µg MADL (*i.e.*, daily limit) under California's Proposition 65, as demonstrated in the table below.

---

[34] Needleman H.L., et al., "The longterm effects of exposure to low doses of lead in childhood—An 11-year follow-up report," N.E.J. MED., Vol. 322 at 83-88 (1990).

[35] World Health Organization, "Lead Poisoning" (Aug. 31, 2022), *available at* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health.

[36] UNICEF, 7 things to know about lead exposure, https://www.unicef.org/stories/7-thingsknow-about-lead-exposure.

| Product | Lead (μg/serving) | Recommended Daily Intake | Daily Lead Intake | % of Prop 65 Daily Limit |
|---|---|---|---|---|
| Metamucil Sugar Free On-the-Go Orange Flavored | 1.15 | 1 to 6 packets | 1.15 - 6.90 | 230% - 1,380% |
| Metamucil Sugar Free Orange Flavored | 1.68 | 1 to 6 rounded teaspoons | 1.68 - 10.08 | 336% - 2,016% |
| Metamucil Sugar Free Berry Flavored | 2.05 | 1 to 6 rounded teaspoons | 2.05 - 12.30 | 410% - 2,460% |
| Metamucil No Added Sweeteners Unflavored | 1.91 | 1 to 6 rounded teaspoons | 1.91 - 11.46 | 382% - 2,292% |
| Metamucil Made with Real Sugar Orange Flavored | 0.75 | 1 to 6 rounded tablespoons | 0.75 - 4.48 | 149% - 895% |
| Metamucil Made with Real Sugar Unflavored | 2.27 | 1 to 6 rounded teaspoons | 2.27 - 13.62 | 454% - 2,724% |
| Metamucil Fiber + Collagen Peptides Orange Flavored | 0.34 | 2 to 6 heaping teaspoons | 0.34 - 1.01 | 67.2% - 201.6% |
| Metamucil Premium Blend Orange Flavored | 1.05 | 1 to 6 rounded teaspoons | 1.05 - 6.30 | 210% - 1,260% |

### C.      P&G Omits Material Information About the Presence of Lead in Metamucil, and its Related Health Harms

51.      P&G has known that the Metamucil Products contain lead since at least March 2021 when Consumer Lab published a report concerning the lead content of various psyllium fiber supplements, showing up to 14.6 μg per serving in Metamucil Sugar Free Orange Flavored.

52.      That P&G is responsible for the lead being present at such unreasonably dangerous levels in the Metamucil Products is also manifest in the fact that other brands of psyllium fiber tested at levels below that of the Metamucil Products.

53.      For example, Consumer Labs found that Yerba Prima Psyllium Whole Husks contained at most 0.4 μg lead per serving, compared to Metamucil's 14.6 μg—more than 36 times the amount found in Yerba Prima. Even so, Yerba Prima places the warning required by Proposition 65 on its products, including its psyllium husks.

54.      Omitting material information regarding the Products' lead content while its competitors, such as Yerba Prima, appropriately warned consumers of the lead content of competing psyllium fiber supplements, allowed P&G to charge more for the Metamucil Products than it otherwise could have, and

1   further allowed P&G to obtain a greater share of the market than it otherwise would have absent its

2   omissions.

3        55.    As a public company and global healthcare brand with tens of billions in annual sales, P&G

4   has earned significant public trust that Metamucil is safe and fit for regular consumption. Reasonable

5   consumers believe P&G would not sell products that are unsafe.

6        56.    P&G knew or should have known it owed consumers a duty of care to adequately test the

7   Metamucil Products for lead and other heavy metals. Had P&G done so, it would have known the Metamucil

8   Products contain significant levels of lead.

9        57.    P&G knew or should have known it could control the levels of lead and other heavy metals

10   in the Metamucil Products by properly monitoring for their presence, sourcing ingredients with fewer heavy

11   metals, adjusting the Metamucil Products' formulations to reduce or eliminate heavy metals, and improving

12   its manufacturing processes to eliminate introduction of lead caused by P&G itself. In the interest of cost-

13   savings, however, P&G failed to implement sufficient quality control systems and procedures in

14   Metamucil's formulation and manufacturing.

15        58.    According to P&G, it has "strict product safety limits in place when" heavy metals, including

16   lead, "could be found in tiny amounts due to their natural (or background) presence in water, the

17   environment, or as part of the manufacturing process," which apply to "any of [P&G's] formulated

18   products," including its "health care" products like Metamucil.[37]

19        59.    P&G knew or should have known that Plaintiff and other Class Members would rely upon

20   the packaging and advertising of Metamucil Products stating or suggesting that the products are healthy and

21   safe when used as directed, and P&G intended for consumers to do so.

22        60.    P&G knew or should have known that reasonable consumers would consume Metamucil

23   Products regularly, up to three times each day, leading to repeated lead exposure, which accumulates in the

24   body and its systems over time, even if each individual exposure is "low." Indeed, P&G encouraged such

25   daily, repeated consumption behavior. Thus, the cumulative effect of consuming the Metamucil Products

26

27   [37] *See* https://pgpro.com/en-us/brands/pg-pro-line/high-affinity-premium-durable-floor-finish; *see also*

28   https://us.pg.com/ingredients (further noting the strict product safety limits in place for heavy metals,
     including lead, in all P&G products).

multiple times daily renders the amount of lead unreasonably dangerous to consumers.

61.     While representing that the Metamucil Products are beneficial to health, P&G regularly omitted and continues to omit material information regarding the presence and countervailing detrimental health effects of the high levels of lead in the Metamucil Products.

62.     Nowhere on the label of Metamucil, nor in the off-label advertising for the Metamucil Products, including on its website, does P&G disclose to consumers the lead content of the products, nor even the possibility that consuming the products may expose consumers to lead. To the contrary, as noted in paragraph 30, P&G's website expressly states that heavy metals are *not* in its products.

63.     P&G is under a duty to disclose this information to consumers because it is revealing some information about Metamucil—enough to suggest it is safe for consumption and beneficial to health—without revealing directly relevant information regarding the presence and harmful effects of lead in the Metamucil Products described herein.

64.     P&G is further under a duty to disclose this information because its deceptive omissions concern human health and safety, specifically the detrimental health consequences of consuming Metamucil.

65.     P&G is further under a duty to disclose this information because it was in a superior position to know of the dangers presented by the lead in Metamucil, as it is a large, sophisticated company that holds itself out as having expert knowledge regarding the health impact of consuming the Metamucil Products.

66.     For example, P&G includes medical advice on the Metamucil Product labeling and includes a toll-free number where it answers questions about the Metamucil Products. Below the toll-free number, P&G directs consumers to its website, www.pg.com, and the Metamucil Product website, www.metamucil.com, both of which tout P&G's expertise. The Metamucil website includes, for example, additional medical advice and videos of medical professionals wearing lab coats and discussing the health benefits of consuming Metamucil. On the its website, P&G claims to "apply the same science-based approach as regulatory agencies around the world" when making ingredient choices for its products, beneath an image of a scientist in a lab coat.

67.     Finally, P&G is further under a duty to disclose this information because, including through the acts alleged herein, it actively concealed material facts not known to Plaintiff and other Class Members

1  concerning lead in the Metamucil Products, and the detrimental effects thereof.

2        **D.**    **The Metamucil Labeling is False and Misleading in Light of the Products' Lead**

3               **Content**

4        68.    P&G's express statements and suggestions that Metamucil is healthy and safe for

5  consumption as directed are false and misleading because the Metamucil Products' high lead content means

6  the products are, in fact, not healthy, nor safe for regular consumption. To the contrary, regular consumption

7  of the Metamucil Products in the repeated, daily manner P&G promotes exposes consumers to unsafe levels

8  of lead. This concern is even more heightened for pregnant women and children aged 12 to 18 who use the

9  Products.

10        69.    Given the toxic effects of lead, the presence of unsafe levels of toxic heavy metals in the

11  Metamucil Products is a material fact to reasonable consumers, including Plaintiff and other Class Members.

12  If the presence, or the risk of presence of unsafe levels of toxic heavy metals in Metamucil Products were

13  disclosed to Plaintiff and other Class Members, they would be unwilling to purchase the products, or to pay

14  as much for the Metamucil Products as they paid. P&G's omission of Metamucil's lead content is therefore

15  deceptive.

16  **IV.**    **The Metamucil Products' Labeling Violates California and Federal Law**

17        70.    The Metamucil Products and their challenged labeling statements violate California Health

18  and Safety Code §§109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food

19  labeling requirements as its own. *See*, *e.g.*, *id.* § 110100; *id.* § 110670 ("Any food is misbranded if its

20  labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21

21  U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto.").

22        71.    First, the challenged claims are false and misleading for the reasons described herein, in

23  violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in

24  any particular." P&G accordingly also violated California's parallel provision of the Sherman Law. *See* Cal.

25  Health & Safety Code § 110670.

26        72.    Second, despite making the challenged claims, P&G "fail[ed] to reveal facts that are material

27  in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any

28  combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include that the Metamucil Products

contain lead, and the detrimental health consequences of consuming the Metamucil Products as a result of their lead content.

73.     Third, P&G failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of § 1.21(a)(2). Specifically, P&G failed to disclose the detrimental health consequences likely to result from the usual consumption of the Products in the customary and prescribed manners, including regular consumption of the standard serving size. This is especially true because P&G, through a variety of means, encourages consumers to ingest Metamucil multiple times per day.

74.     Fourth, the Metamucil Products violate California Health and Safety Code §§ 25249.5 *et seq.* (Proposition 65), which requires California consumers be informed "about exposures to chemicals that cause cancer, birth defects and other reproductive harm." Cal. Health & Safety Code § 25249.6. Despite that the Metamucil Products each expose consumers to amounts of lead in excess of the Proposition 65 MADL, P&G failed to provide the clear and reasonable warning to consumers required by Cal. Health & Safety Code § 25249.6.

75.     Fifth and finally, P&G has misbranded its Metamucil Products in violation of the Sherman Law by failing to disclose the presence of lead on the products' labels as required by 21 U.S.C. § 343, which states that food is misbranded "unless its label bears . . . the common or usual name of each . . . ingredient." Under this regulation, food manufacturers like P&G are required to list all ingredients in a food, unless those ingredients are subject to an exemption from this requirement. Because lead is not subject to any exemption under applicable law, but P&G did not list lead as an ingredient—and in fact its website expressly disclaimed using lead as an ingredient—P&G misbranded the Metamucil Products.

## V.     Plaintiff's Purchase, Reliance, and Injury

76.     Plaintiff Tara Amado purchased Metamucil Made With Real Sugar and Metamucil on-the-go! during the Class Period starting in approximately late 2017 or early 2018, with her last purchase in early 2022. Plaintiff often made her purchases from stores such as CVS, Target, and Walgreens in San Bruno, California.

77.     In purchasing the Metamucil Products, Plaintiff read and relied on claims that suggested the

Products were healthy and safe for consumption, including P&G's representations that the products are "Doctor Recommended," are to be taken "daily" "up to 3 times per day." Plaintiff further read and relied on representations that the Metamucil Products have been sealed for safety, including "Do Not Use If Printed Seal Is Broken Or Missing," "Individual Packets Sealed For Your Protection," and "Do Not Use If Package Is Torn." These claims, however, were and are deceptive because the Metamucil Products contain unsafe levels of lead.

78.     When purchasing Metamucil Products, Plaintiff was looking for a healthy and safe fiber supplement and, based on P&G's statements and omissions, believed that was what she was receiving. Plaintiff would have avoided any Metamucil Product if she knew contained toxic heavy metals, like lead. Plaintiff likewise would have avoided any Metamucil Product she knew could increase her risk of inhibited neurological function, anemia, kidney damage, a compromised immune system, seizures, coma, and death.

79.     Plaintiff acted reasonably in relying on the challenged labeling claims, which P&G intentionally placed on the Metamucil Products' labeling with the intent to induce average consumers into purchasing the products.

80.     Plaintiff acted reasonably in purchasing the Metamucil Products, whose labels did not disclose the presence, or even the risk of the presence, of unsafe levels of lead, and in fact conveyed to reasonable consumers that the products are healthy and safe for consumption.

81.     Plaintiff would not have purchased the Metamucil Products if she knew that the challenged claims were false and misleading in that the Metamucil Products are not healthy or safe for consumption.

82.     The Metamucil Products cost more than similar products without misleading labeling and would have cost less absent P&G's affirmative health and safety statements and deceptive omissions regarding the products' lead content.

83.     Through the misleading labeling claims and omissions, P&G was able to gain a greater share of the fiber supplement market than it otherwise would have, and to increase the size of the market.

84.     Plaintiff paid more for the Metamucil Products, and would only have been willing to pay less, or unwilling to purchase them at all, absent the false and misleading labeling complained of herein.

85.     Plaintiff would not have purchased the Metamucil Products if she had known that the products were misbranded pursuant to California and FDA regulations, violated California's Proposition

1    65, or contained unsafe levels of toxic lead in the amounts found in the products.

2    86.    For these reasons, the Metamucil Products were worthless or at least had less value than what

3    Plaintiff and the Class paid for them.

4    87.    Instead of receiving products that were safe to consume, the Metamucil Products that

5    Plaintiff and the Class received were likely to lead to increased risk of disease and death when consumed

6    regularly, and as P&G directed.

7    88.    Plaintiff and the Class lost money as a result of P&G's deceptive claims, omissions, and

8    practices in that they did not receive what they paid for when purchasing the Metamucil Products.

9    89.    Plaintiff still wishes to purchase fiber supplement products and continues to see Metamucil

10   Products at the stores in which she regularly shops. She would purchase Metamucil Products in the future

11   if she could be assured that they were healthy and safe for consumption as P&G represents. But because the

12   lead content of a Metamucil Product is not apparent without laboratory testing, unless P&G is enjoined in

13   the manner Plaintiff requests, she will not be able to reasonably determine in the future whether the Products

14   contain lead or the amount of lead they contain.

15   90.    Plaintiff would purchase Metamucil again if she could trust that P&G's representations were

16   true and not false or misleading, and that the absence of a disclaimer regarding lead meant the issue had

17   been addressed such that the Metamucil Products no longer contain harmful amounts of the heavy metal.

18   Absent an injunction, however, Plaintiff will be unable to trust the representations on Metamucil Products

19   when she encounters them in the marketplace.

20   91.    Plaintiff's substantive right to a marketplace free of fraud, where she is entitled to rely on

21   representations such as those made by P&G with confidence, continues to be violated every time Plaintiff

22   is exposed to the Metamucil Product labels.

23   92.    Plaintiff's legal remedies are inadequate to prevent these future injuries.

24                          **CLASS ACTION ALLEGATIONS**

25   93.    While reserving the right to redefine or amend the class definition prior to or as part of a

26   motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiff seeks to

27   represent a class of all persons in California who, at any time from four years preceding the date of the filing

28   of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household

1    use, and not for resale or distribution, any of the Metamucil Products (the "Class").

2        94.    The members in the proposed Class are so numerous that individual joinder of all members

3    is impracticable, and the disposition of the claims of all Class Members in a single action will provide

4    substantial benefits to the parties and Court.

5        95.    Questions of law and fact common to Plaintiff and the Class include:

6            a.    Whether, through labeling and advertising the Metamucil Products, P&G

7        communicated a message that the products are generally healthy and safe to consume;

8            b.    Whether that message was material, or likely to be material, to a reasonable consumer,

9        or whether P&G had reason to believe that it was;

10           c.    Whether the Metamucil Products contain amounts of lead that would be material to a

11       reasonable consumer;

12           d.    Whether the Metamucil Products contain unsafe amounts of lead;

13           e.    Whether the challenged claims are false, misleading, or reasonably likely to deceive a

14       reasonable consumer;

15           f.    Whether P&G was under a duty to disclose information about the Metamucil

16       Products' lead content;

17           g.    Whether P&G omitted information about the Metamucil Products' lead content;

18           h.    Whether P&G's omission was material, or likely to be material to a reasonable

19       consumer;

20           i.    Whether P&G's omission was likely to deceive a reasonable consumer;

21           j.    Whether P&G was unjustly enriched;

22           k.    Whether Plaintiff and the Class are entitled to monetary damages and the measure of

23       those damages;

24           l.    Whether Plaintiff and the Class are entitled to restitution, disgorgement and/or other

25       equitable and injunctive relief, and its proper scope; and

26           m.    Whether Plaintiff and the Class are entitled to attorneys' fees, and the proper amount.

27       96.    These common questions of law and fact predominate over questions that affect only

28    individual Class Members.

97.     Plaintiff's claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to P&G's conduct. Specifically, all Class Members, including Plaintiff, were subjected to the same misleading and deceptive conduct when they purchased the Metamucil Products and suffered economic injury because the products are misrepresented. Absent P&G's business practice of deceptively, unlawfully, and unfairly labeling the Metamucil Products, Plaintiff and Class Members would not have purchased them or would have paid less for them.

98.     Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interests incompatible with the interests of the Class, and has retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

99.     Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

100.    P&G has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

101.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

102.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

103.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

104.    The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

### Fraudulent

105.    A statement or practice is fraudulent under the UCL if it is likely to deceive a significant

1    portion of the public, applying an objective reasonable consumer test.

2    106.   As set forth herein, P&G's health and safety representations, and instructions relating to the

3    Metamucil Products are likely to deceive reasonable consumers and the public.

4                                    **Unlawful**

5    107.   As set forth herein, P&G's health and safety representations and instructions relating to the

6    Metamucil Products are "unlawful" under the UCL in that they violate at least the following laws:

7    •    The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

8    •    The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;

9    •    The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*;

10   •    The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§

11        110100 *et seq.*; and

12   •    Proposition 65, Cal. Health & Safety Code §§ 25249.5 *et seq.*

13                                    **Unfair**

14   108.   P&G's conduct with respect to the labeling, advertising, and sale of the Metamucil Products

15   with health and safety representations and instructions was unfair because P&G's conduct was immoral,

16   unethical, unscrupulous, or substantially injurious to consumers, and the utility of its conduct, if any, did

17   not outweigh the gravity of the harm to its victims.

18   109.   P&G's conduct with respect to the labeling, advertising, and sale of the Metamucil Products

19   with health and safety representations and instructions was also unfair because it violated public policy as

20   declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited

21   to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, portions of the

22   California Sherman Food, Drug, and Cosmetic Law, and portions of California's Health and Safety Code.

23   110.   P&G's conduct with respect to the labeling, advertising, and sale of the Metamucil Products

24   with health and safety representations and instructions was and is also unfair because the consumer injury

25   was substantial, not outweighed by benefits to consumers or competition, and not one consumers themselves

26   could reasonably have avoided. Specifically, the increase in profits obtained by P&G through the misleading

27   labeling does not outweigh the harm to Class Members who were deceived into purchasing the Metamucil

28   Products believing the products were healthy and safe for regular consumption when in fact they contain

unhealthy and dangerous amounts of lead. Consumers could not have reasonably avoided the harm because this would have required that they perform laboratory testing to determine whether the Metamucil Products contain lead, which is not a reasonable expectation of consumers. Further, the harm could have easily been avoided by P&G as it would have cost P&G nothing to refrain from using the challenged claims or add the omitted information regarding the products' lead content.

111.    P&G profited from the sale of the falsely, deceptively, and unlawfully advertised the Metamucil Products to unwary consumers.

112.    Plaintiff and Class Members are likely to continue to be damaged by P&G's deceptive trade practices, because P&G continues to disseminate misleading information. Thus, injunctive relief enjoining P&G's deceptive practices is proper.

113.    P&G's conduct caused and continues to cause substantial injury to Plaintiff and other Class Members. Plaintiff has suffered injury in fact as a result of P&G's unlawful conduct.

114.    In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining P&G from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices.

115.    Plaintiff and the Class also seek an order for the restitution of all monies from the sale of the Metamucil Products, which were unjustly acquired through acts of unlawful competition.

116.    Because Plaintiff's claims under the "unfair" prong of the UCL sweep more broadly than her claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiff's legal remedies are inadequate to fully compensate her for all of P&G's challenged behavior.

## SECOND CAUSE OF ACTION

### Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*

117.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

118.    The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

119.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

120.    As alleged herein, the advertisements, labeling, policies, acts, and practices of P&G relating to the Metamucil Products were likely to mislead consumers acting reasonably as to the safety of regularly consuming the Metamucil Products, and also as to the presence of significant amounts of lead in the products.

121.    Plaintiff suffered injury in fact as a result of P&G's actions as set forth herein because she purchased the Metamucil Products in reliance on P&G's false and misleading marketing claims stating or suggesting that the Metamucil Products are healthy and safe for regular consumption, along with its omission of material information concerning the Metamucil Products' lead content.

122.    P&G's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because P&G has advertised the Metamucil Products in a manner that is untrue and misleading, which P&G knew or reasonably should have known, and omitted material information from the Metamucil Products' labeling.

123.    P&G profited from the sale of the falsely and deceptively advertised Metamucil Products to unwary consumers.

124.    As a result, Plaintiff, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which P&G was unjustly enriched.

125.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of herself and the Class, seek an order enjoining P&G from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

126.    Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiff's breach of warranty claims), and restitution is not limited to returning to Class Members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

1

**THIRD CAUSE OF ACTION**

2

**Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.***

3      127.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth

4   fully herein.

5      128.    The CLRA prohibits deceptive practices in connection with the conduct of a business that

6   provides goods, property, or services primarily for personal, family, or household purposes.

7      129.    P&G's false and misleading labeling and other policies, acts, and practices were designed to,

8   and did, induce the purchase and use of the Metamucil Products for personal, family, or household purposes

9   by Plaintiff and Class Members, and violated and continue to violate the following sections of the CLRA:

10          a.      § 1770(a)(5): representing that goods have characteristics, uses, or benefits which

11      they do not have;

12          b.      § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if

13      they are of another;

14          c.      § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

15          d.      § 1770(a)(16): representing the subject of a transaction has been supplied in

16      accordance with a previous representation when it has not.

17      130.    P&G profited from the sale of the falsely, deceptively, and unlawfully advertised Metamucil

18   Products to unwary consumers.

19      131.    P&G's wrongful business practices constituted, and constitute, a continuing course of

20   conduct in violation of the CLRA.

21      132.    As a result of P&G's wrongful behavior, Plaintiff and the Class have suffered harm.

22      133.    On November 13, 2023, Plaintiff sent P&G notice of its violations of the CLRA, which P&G

23   received on November 20, 2023. While Plaintiff presently seeks only injunctive relief and restitution for

24   P&G's violation of the CLRA, if P&G does not, within 30 days of receiving the notice, rectify its wrongful

25   practices, Plaintiff may amend this complaint to seek actual and punitive damages.

26      134.    In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently

27   herewith.

28

1

**FOURTH CAUSE OF ACTION**

2

**Breach of Implied Warranty of Merchantability, Cal. Com. Code §§ 2314(2)(a), (c), (f)**

3      135.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth

4    in full herein.

5      136.    P&G is a merchant with respect to the goods of this kind which were sold to Plaintiff and the

6    Class, and there were, in the sale to Plaintiff and the Class, implied warranties that those goods were

7    merchantable.

8      137.    Specifically, P&G impliedly warranted to retail buyers that the Metamucil Products were

9    merchantable in that they (i) would pass without objection in the trade or industry under the contract

10   description, (ii) were fit for the ordinary purposes for which the Products are used, and (iii) conform to the

11   promises or affirmations of fact made on the container or label.

12     138.    P&G breached this implied warranty because the Metamucil Products were unsafe in that

13   they contained toxic lead, such that the products would not pass without objection in the trade or industry;

14   were not fit for the ordinary purpose for which they are used, which is consumption by consumers 12 years

15   and older; and did not conform to the health and safety representations made on the products' labels.

16     139.    P&G was on notice of this breach as it was aware of the lead in the Metamucil Products,

17   including based on receiving notice in at least 2021.

18     140.    As an actual and proximate result of P&G's conduct, Plaintiff and the Class did not receive

19   goods as impliedly warranted by P&G to be merchantable in that they did not conform to promises and

20   affirmations made on the container or label of the goods, would not pass without objection in the trade or

21   industry, and were not fit for the ordinary purpose for which they are used.

22     141.    As a result, Plaintiff seeks, on behalf of herself and other Class Members, actual damages,

23   including, without limitation, expectation damages.

24

**FIFTH CAUSE OF ACTION**

25

**Unjust Enrichment**

26     142.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth

27   in full herein.

28     143.    Plaintiff and Class Members conferred upon P&G an economic benefit, in the form of profits

30

resulting from the purchase and sale of the Metamucil Products.

144.    P&G's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to Plaintiff's and Class Members' purchases of the Metamucil Products and the economic benefits conferred on P&G are a direct and proximate result of its unlawful and inequitable conduct.

145.    It would be inequitable, unconscionable, and unjust for P&G to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

146.    As a result, Plaintiff and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which may have been obtained by P&G as a result of such business practices.

## SIXTH CAUSE OF ACTION

### Negligent Misrepresentation

147.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth in full herein.

148.    P&G marketed the Metamucil Products in a manner conveying to reasonable consumers that the products are healthy and safe for regular consumption.

149.    In marketing the Metamucil Products, P&G held itself out as expert in health and fiber supplements generally, as well as in providing safe ingredients.[38]

150.    P&G's misrepresentations regarding the Metamucil Products are material to a reasonable consumer because they relate to human health and safety. Reasonable consumers would attach importance to such representations and would be induced to act thereon in making purchase decisions.

151.    In selling the Metamucil Products, P&G acted in the ordinary course of its business and had a pecuniary interest in Plaintiff and other Class Members purchasing the Metamucil Products.

152.    P&G owed a duty of care to Plaintiff and other Class Members not to provide them false

---

[38] *See*, *e.g.*, https://us.pg.com/product-safety ("For over 181 years, your safety and the safety of your world has been at the heart of what we do. That's why we have a team of more than 500 scientists and professionals and a rigorous safety process to analyze every ingredient—before we ever consider putting it in one of our products.").

1    information when they were making their purchase decisions regarding the Metamucil Products.

2         153.    P&G knew or was negligent in not knowing that the Metamucil Products are not healthy and

3    safe for consumption due to their harmful levels of lead. P&G had no reasonable grounds for believing its

4    misrepresentations were not false and misleading.

5         154.    P&G intends that Plaintiff and other consumers rely on these representations, as evidenced

6    by the intentional and conspicuous placement of the misleading representations on the Metamucil Products'

7    packaging by P&G and its encouraging consumers to ingest multiple servings of the products daily.

8         155.    Plaintiff and other Class Members reasonably and justifiably relied on P&G's

9    misrepresentations when purchasing the Metamucil Products; had the correct facts been known, they would

10   not have purchased the products at the prices at which the products were offered.

11        156.    Therefore, as a direct and proximate result of P&G's negligent misrepresentations, Plaintiff

12   and other Class Members have suffered economic losses and other general and specific damages, in the

13   amount of the Metamucil Products' purchase prices, or some portion thereof, and any interest that would

14   have accrued on those monies, all in an amount to be proven at trial.

15                                    **SEVENTH CAUSE OF ACTION**

16                                    **Intentional Misrepresentation**

17        157.    Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth

18   in full herein.

19        158.    P&G marketed the Metamucil Products in a manner conveying to reasonable consumers that

20   the Products are healthy and safe for regular consumption. However, consuming lead is unsafe and harms,

21   rather than supports the overall health of the average consumer.

22        159.    P&G's misrepresentations regarding the Metamucil Products are material to a reasonable

23   consumer because they relate to human health and safety. A reasonable consumer would attach importance

24   to such representations and would be induced to act thereon in making a purchase decision.

25        160.    At all relevant times, P&G knew that the misrepresentations were misleading, or has acted

26   recklessly in making the misrepresentations, without regard to their truth.

27        161.    P&G intends that Plaintiff and other consumers rely on these misrepresentations, as

28   evidenced by the intentional and conspicuous placement of the misleading representations on the Metamucil

1  Products' packaging by P&G and its encouraging consumers to ingest multiple servings of the products

2  daily.

3  162.  Plaintiff and other Class Members reasonably and justifiably relied on P&G's intentional

4  misrepresentations when purchasing the Metamucil Products; had the correct facts been known, they would

5  not have purchased the products at the prices at which the products were offered.

6  163.  Therefore, as a direct and proximate result of P&G's intentional misrepresentations, Plaintiff

7  and other Class Members have suffered economic losses and other general and specific damages, in the

8  amount of the Metamucil Products' purchase prices, or some portion thereof, and any interest that would

9  have accrued on those monies, all in an amount to be proven at trial.

10  **EIGHTH CAUSE OF ACTION**

11  **Violations of Proposition 65, California Health & Safety Code §§ 25249.5 *et seq.***

12  164.  Plaintiff realleges and incorporates the allegations elsewhere in the Complaint as if set forth

13  fully herein.

14  165.  The Citizens of California have expressly stated in the Safe Drinking Water and Toxic

15  Enforcement Act of 1986, California Health & Safety Code §§ 25249.5, *et seq*, that they must be informed

16  "about exposures to chemicals that cause cancer, birth defects and other reproductive harm." Cal. Health &

17  Safety Code § 25249.6.

18  166.  P&G has engaged in the manufacture, distribution, selling, marketing or offering of the

19  Metamucil Products for sale or use in violation of Cal. Health & Safety Code § 25249.6, and this has

20  continued to occur beyond P&G's receipt of Plaintiff's 60-day notice. Such violations are likely to continue

21  to occur in the future.

22  167.  After receipt of Plaintiff's 60-day notice, on information and belief, the appropriate public

23  enforcement agencies have not commenced and diligently prosecuted a cause of action against P&G under

24  Proposition 65 regarding the lead content of the Metamucil Products as alleged herein.

25  168.  P&G knew or should have known, that Metamucil Products manufactured, distributed, sold,

26  marketed and offered in the State of California expose individuals to lead through the instructed use, *i.e.*,

27  consumption. As a result, P&G knew, or should have known, that the typical and reasonably foreseeable

28  use of the Metamucil Products has caused and continues to cause exposure to lead in amounts in excess of

1    the applicable Proposition 65 MADL.

2    169.    Despite this knowledge, P&G failed to provide a "clear and reasonable warning" to

3    consumers of the Metamucil Products.

4    170.    Continuing commission by P&G of the acts alleged herein has harmed and will continue to

5    irreparably harm the citizens of the State of California, for which harm they have no plain, speedy, or

6    adequate remedy at law.

7    171.    By the above-described acts, P&G is liable, pursuant to Cal. Health & Safety Code §

8    25249.7(b), for a civil penalty for each unlawful exposure to the lead from the Metamucil Products.

9    172.    Cal. Health & Safety Code § 25249.7(b) further authorizes the Court to grant injunctive relief

10   against P&G as a consequence of the above-described acts.

11                              **PRAYER FOR RELIEF**

12   173.    Wherefore, Plaintiff, on behalf of herself, all others similarly situated, and the general public,

13   prays for judgment against P&G as to each and every cause of action, and the following remedies:

14           a.    An Order declaring this action to be a proper class action, appointing Plaintiff as

15   Class Representative, and appointing Plaintiff's undersigned counsel as Class Counsel;

16           b.    An Order requiring P&G to bear the cost of Class notice;

17           c.    An Order compelling P&G to destroy all misleading and deceptive advertising

18   materials and product labels, and to recall all offending products;

19           d.    An Order requiring P&G to disgorge all monies, revenues, and profits obtained by

20   means of any wrongful act or practice;

21           e.    An Order requiring P&G to pay restitution to restore all funds acquired by means of

22   any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or

23   practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

24           f.    An Order requiring P&G to pay compensatory, statutory, and punitive damages as

25   permitted by law;

26           g.    An Order assessing civil penalties pursuant to Cal. Health & Safety Code §

27   25249.7(b), against P&G for each violation alleged herein;

28           h.    An Order, pursuant to Cal. Health & Safety Code § 25249.7(b), enjoining P&G from

distributing or selling the Products in California without first providing a clear and reasonable warning that users of the Metamucil Products are exposed to the lead therein;

      i.     An award of attorneys' fees and costs; and

      j.     Any other and further relief that Court deems necessary, just, or proper.

### JURY DEMAND

174.    Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: December 6, 2023           /s/ Melanie Persinger

                 **FITZGERALD JOSEPH LLP**
                 JACK FITZGERALD
                 *jack@fitzgeraldjoseph.com*
                 PAUL K. JOSEPH
                 *paul@fitzgeraldjoseph.com*
                 MELANIE PERSINGER
                 *melanie@fitzgeraldjoseph.com*
                 TREVOR M. FLYNN
                 *trevor@fitzgeraldjoseph.com*
                 CAROLINE S. EMHARDT
                 *caroline@fitzgeraldjoseph.com*
                 2341 Jefferson Street, Suite 200
                 San Diego, California 92110
                 Phone: (619) 215-1741

                 ***Counsel for Plaintiff***

*Amado v. Procter & Gamble Co.*, No. 23-cv-06308
CLASS ACTION COMPLAINT